IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 1, 2022

**STATE OF TENNESSEE v. BETTY SPARKS**

**Appeal from the Circuit Court for Hardeman County
No. 35CC1-2020-CR-28   J. Weber McCraw, Judge**

_____

**No. W2021-01213-CCA-R3-CD**

_____

A Hardeman County jury convicted the defendant, Betty Sparks, of first-degree premeditated murder, first-degree felony murder, attempted first-degree murder, aggravated assault with serious bodily injury, and attempted especially aggravated robbery, for which she received an effective sentence of life imprisonment. On appeal, the defendant argues the trial court erred in denying her motion to suppress. She also contends the evidence presented at trial was insufficient to support her convictions. After reviewing the record and considering the applicable law, we affirm the judgments of the trial court. However, we remand the case for corrected judgment forms in counts one and two.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed
and Remanded for Entry of Corrected Judgments**

J. ROSS DYER, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR. and KYLE A. HIXSON, JJ., joined.

William J. Milam, Jackson, Tennessee, for the appellant, Betty Sparks.

Herbert H. Slatery III, Attorney General and Reporter; Hannah-Catherine Lackey, Assistant Attorney General; Mark E. Davidson, District Attorney General; and Joe Van Dyke, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Facts and Procedural History*

This case arises from the shooting and attempted robbery of the victims, Deon Turner and Desiree White[1], on March 22, 2019. For her participation in the crimes, the defendant was indicted for first-degree premeditated murder (count 1), first-degree felony

_____

[1] Desiree White is also referred to as Desirra White throughout the record.

murder (count 2), attempted first-degree murder (count 3), attempted first-degree felony murder (count 4), aggravated assault with serious bodily injury (count 5), and attempted especially aggravated robbery (count 6).[2] Prior to her arrest, the defendant spoke to Tennessee Bureau of Investigation ("TBI") Special Agent Celinda Davidson twice regarding her involvement in the crimes. The defendant subsequently filed a motion to suppress her second statement, and the trial court conducted a pre-trial hearing on March 17, 2021.

## I. Motion to Suppress

In her motion to suppress, the defendant argued she did not waive her *Miranda* rights prior to speaking with Special Agent Davidson the second time, thus rendering her statement involuntary.[3] Additionally, the defendant argued that her interaction with Special Agent Davidson constituted custodial interrogation because it occurred at the Hardeman County Sheriff's Office ("HCSO"), it included both questions from her initial interview as well as new questions, and because Special Agent Davidson's report was "devoid of any reference that the defendant [was] free to refrain from answering questions." The State disagreed and presented the following evidence supporting its position at the suppression hearing.

Special Agent Davidson testified she was assigned to assist in the investigation of the murder of Mr. Turner and was at the Sheriff's Office on March 25, 2019, in that capacity. As she was walking through the lobby, Special Agent Davidson observed the defendant and stopped to speak with her. At the time, the defendant was not a suspect but had given a *Mirandized* statement several days prior regarding Mr. Turner's murder. Special Agent Davidson agreed that she did not *Mirandize* the defendant before speaking with her a second time but testified that the defendant was not in custody during their conversation. Special Agent Davidson and the defendant spoke in the crowded lobby for "less than five minutes," and according to Special Agent Davidson, at no point during their conversation did the defendant attempt to leave the lobby or state that she did not want to speak with Special Agent Davidson. Following their conversation, Special Agent Davidson prepared an investigative report which she attached to the case file.

After its review, the trial court issued an order denying the defendant's motion to suppress the statement, finding the defendant's conversation with Special Agent Davidson was not a custodial interrogation. The defendant then proceeded to trial.

## II. Trial

---

[2] Prior to trial, the State amended the indictment and entered a nolle prosequi for count 4.

[3] *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

The evidence produced at trial showed that on March 21, 2019, Desiree White was spending the night at the home of her boyfriend, Deon Turner. At some point during the night, Ms. White was awakened by Mr. Turner, who stated that he had been shot. Ms. White immediately realized that she had also been shot, so Mr. Turner helped her into the car and drove them to his step-brother, Tyler Sims', house.

Mr. Sims woke up to a car horn honking outside of his house at 5:45 a.m. When he went outside, he saw Mr. Turner, who was "pouring blood." Mr. Turner told Mr. Sims that "[t]hey got me two or three good times," but refused to say who had shot him. Mr. Sims then helped Mr. Turner into the house and told his girlfriend to call 911. While tending to Mr. Turner, Mr. Sims again heard a car honking outside and discovered Ms. White, who had lost consciousness on the way to Mr. Sims' house, inside the passenger seat of Mr. Turner's vehicle. Mr. Sims placed Ms. White in a recliner in the living room and tried to keep her awake, but she "was passing in and out on [him] the whole time." When medical personnel arrived, they placed Mr. Turner and Ms. White in an ambulance and drove them to a nearby church parking lot where they were taken by helicopter to the hospital.

Kaci Burcham and Michael Mayfield, Jr., pleaded guilty for their roles in the crimes and testified as State's witnesses at trial. Ms. Burcham, who was in a relationship with the defendant's son, Steven Sparks, at the time of the incident, testified that Mr. Sparks was pulled over by police on March 15, 2019, and arrested after officers discovered ecstasy pills in his vehicle. Ms. Burcham and the defendant began raising money to pay Mr. Sparks' bail, and Mr. Turner told them he would contribute one thousand dollars. However, when Mr. Turner did not give the money to the defendant, she was forced to get a loan in Mr. Sparks' name to bail him out of jail on March 20, 2019. The defendant was "upset" that Mr. Turner did not give them the money he had promised and told Ms. Burcham not to post anything on Facebook about Mr. Sparks getting out of jail because "she was still going to try getting the money [from Mr. Turner] because [they] needed it." That evening, Ms. Burcham overheard a conversation between the defendant and Mr. Sparks during which the defendant stated that she messaged Mr. Turner, but he had not brought her the money, so "she wanted it took care of." Ms. Burcham assumed that this meant the defendant wanted Mr. Turner "taken care of." Mr. Sparks responded that he did not want to talk about it, and the defendant replied, "I'm just saying it needs to be took care of." According to Ms. Burcham, prior to this conversation, Mr. Sparks had not made any plans regarding Mr. Turner.

The next day, when Mr. Sparks came home from work, he told Ms. Burcham that Mr. Turner, who worked at the same company as Mr. Sparks, quit his job and that some of their coworkers told Mr. Sparks that his arrest "was a setup." Mr. Sparks told Ms. Burcham that "he had business to take care of" and that there was "no other way to handle it." Ms.

Burcham knew Mr. Sparks was referring to Mr. Turner. Mr. Sparks then texted someone about purchasing a gun, and he and Ms. Burcham met a man on a side road and bought a black .9-millimeter handgun. Mr. Sparks called his friend, Mr. Mayfield, and told him that he needed his help with something. They picked Mr. Mayfield up at his girlfriend's house and drove to a Walmart in Corinth, Mississippi at approximately 1:30 a.m. where they purchased .9-millimeter ammunition, shotgun shells, Remington gun oil, a backpack, a black pullover, and a hatchet. After leaving Walmart, they stopped at a gas station where Mr. Sparks purchased a black toboggan. After picking up another friend, Terry Martindale, they drove back to Mr. Sparks' apartment, where they used meth and smoked marijuana, and Mr. Sparks dispersed the weapons and clothing. Mr. Martindale was given a shotgun and ghillie suit;[4] Mr. Mayfield was given the backpack, hatchet, and a pistol belonging to the defendant; and Mr. Sparks kept the .9-millimeter purchased earlier that evening. Ms. Burcham's role was to drive them to and from Mr. Turner's house.

Before leaving the apartment, Mr. Sparks informed the group that they were going to Mr. Turner's house to kill him and steal his ecstasy pills along with anything else they could grab. According to Ms. Burcham, while Mr. Sparks was in jail, she and the defendant went to Mr. Turner's house several times to wait for Mr. Turner to give them the bail money, and the defendant intimated to Ms. Burcham that she knew Mr. Turner kept his ecstasy pills in the top drawer of his dresser.

Approximately twenty-five minutes after dropping Mr. Sparks, Mr. Mayfield, and Mr. Martindale off at Mr. Turner's house, Ms. Burcham drove back to the area but did not see anyone. Eventually, Mr. Sparks and Mr. Mayfield made their way back to the car; however, they were unable to locate Mr. Martindale, who went to a nearby house. He was able to get a ride to a gas station, and Mr. Sparks asked the defendant to pick him up and bring him to Mr. Sparks' apartment. When they arrived at the apartment, Mr. Sparks yelled at Mr. Martindale for getting lost and for leaving the ghillie suit and shotgun in the woods. The defendant then asked Mr. Sparks if "it was took care of," and Mr. Sparks responded that "[i]t should be" because he "unloaded a whole clip." The defendant also asked if they had "gotten anything that [they] were supposed to, like the drugs [or] money." From the defendant's questions, Ms. Burcham deduced that the defendant knew what Mr. Sparks had planned to do to Mr. Turner that night. The defendant agreed to take Mr. Mayfield home and stated that she would "see what [she could] find out. [She would] drive by" Mr. Turner's house. Before everyone left Mr. Sparks' apartment, he told them that "if [they] thought about it, prayed about it, [or] spoke to anybody about it, . . . he would kill [them]."

---

[4] A ghillie suit is a type of camouflage clothing that resembles the background environment, often made to look like twigs, leaves, and foliage.

Ms. Burcham then took Mr. Sparks to work and burned the boots that Mr. Sparks wore during the murder. The next day, the defendant and Mr. Sparks burned the bandanas and the black toboggan used during the murder. To create an alibi, Mr. Sparks told Ms. Burcham to say that they were at a friend's house in Mississippi all night. Additionally, because Mr. Martindale had scratches on his face from running in the woods, the defendant and Mr. Sparks fabricated a story that Mr. Martindale and Mr. Mayfield got into an argument about fentanyl in the backseat of the car, and Mr. Mayfield scratched Mr. Martindale's face with a fork.

During cross-examination, Ms. Burcham discussed the statements she gave to the TBI following the murder. She stated that she did not tell the truth in her first statement because she was afraid of Mr. Sparks. Ms. Burcham also acknowledged that she did not tell investigators that she had burned Mr. Sparks' boots until the week of the trial. On redirect examination, Ms. Burcham agreed that her proffer to the TBI was the truth and stated that "[her] lawyer was surprised because he didn't know all of it."

Mr. Mayfield then explained his involvement in the crimes, noting Mr. Sparks called him at 10:00 p.m. and said that he was coming to see him. Mr. Mayfield told him that it was not a good idea, but Mr. Sparks showed up with Ms. Burcham and told Mr. Mayfield that he needed him to "ride with him somewhere." Although Mr. Mayfield did not want to go, he owed Mr. Sparks money for a prior drug deal, and so he went with them.

After leaving Mr. Mayfield's house, the group went to Walmart and purchased equipment that Mr. Sparks explained was for "camping." Afterward, they picked up Mr. Martindale and drove back to Mr. Sparks' apartment. There, they "smoked some weed," and Mr. Sparks told Mr. Mayfield to go in the bedroom and "grab what was on the bed." Mr. Mayfield picked up a shotgun and a chrome pistol that he recognized as belonging to the defendant. Mr. Sparks gave the shotgun and a ghillie suit to Mr. Martindale and told everyone "that his dope boy had owed him some money and we was going to take his money."

When Ms. Burcham stopped the car near Mr. Turner's house, Mr. Martindale went into the woods, and Mr. Sparks told Mr. Mayfield to follow him. They approached the back of the house and entered through the back door into the kitchen. Mr. Sparks began looking through the kitchen drawers as well as a Walmart bag that was sitting on the counter. They entered the living room, and Mr. Mayfield could see the light from a television in Mr. Turner's bedroom. As Mr. Sparks walked toward the bedroom, Mr. Mayfield turned to go to the back door when he "heard a bunch of gunshots go off." Mr. Mayfield stood frozen at the back door until he felt Mr. Sparks push past him, and they both began running down the road.

Ms. Burcham drove Mr. Mayfield and Mr. Sparks back to Mr. Sparks' apartment, and later, the defendant picked Mr. Martindale up at a gas station and brought him to the apartment where Mr. Martindale and Mr. Sparks argued about Mr. Martindale leaving the ghillie suit and shotgun in the woods. The defendant asked Mr. Sparks if "he had got anything and he said no but he took care of it," and at that point, Mr. Mayfield "knew [the defendant] had knowledge about [the murder]." Mr. Mayfield asked the defendant to drive him home, and Mr. Sparks told Mr. Mayfield to go by the woods to collect the ghillie suit and shotgun. However, Mr. Mayfield lost his glasses while running from Mr. Turner's house, so the defendant stated that she would do it.

The defendant and Mr. Mayfield drove toward Mr. Turner's house. However, there was an investigator blocking the street who asked them where they were going. The defendant froze, so Mr. Mayfield stated that he was going to get his driver's license from his ex-girlfriend's house. The investigator told them to turn around, and the defendant drove Mr. Mayfield back to his house. While they were driving, the defendant called Mr. Sparks and asked him where her pistol was, and Mr. Sparks told her that "he had it put up."

The next day, Mr. Sparks called Mr. Mayfield and gave him an alibi to tell the police if he was ever questioned about the night of the murder. Mr. Sparks told Mr. Mayfield to say that he and Mr. Martindale were fighting about fentanyl in the backseat of the car when Mr. Mayfield scratched Mr. Martindale's face with a fork. Mr. Sparks also told Mr. Mayfield to say that they were drinking at a guy named Timmy's house in Mississippi until 2:30 a.m., and then they went to Mr. Sparks' apartment and "passed out." Mr. Mayfield could hear the defendant in background during his conversation with Mr. Sparks regarding the alibis. The defendant also sent Mr. Mayfield Facebook messages corroborating both the story about the driver's license that Mr. Mayfield fabricated when the police stopped him as well as the alibi Mr. Sparks and the defendant created.

During cross-examination, Mr. Mayfield agreed that he lied in his first two statements to investigators, but insisted this was only because he "was scared." On redirect examination, Mr. Mayfield stated that he did not have an attorney at the time he gave his first statement.

Larry Turner, Mr. Turner's father, testified that, during the week leading up to the shooting, Mr. Turner asked if he could borrow money to get Mr. Sparks out of jail.[5] However, although he had loaned Mr. Turner money to bail Mr. Sparks out of jail in the past, he declined to do so this time. The night that Mr. Sparks got out of jail, approximately ten hours before the murder, Larry saw a Facebook post by the defendant that he believed

---

[5] Because Deon Turner and Larry Turner share the same last name, we will refer to Larry Turner by his first name. We intend no disrespect.

may have been related to Mr. Turner. In the post, the defendant thanked the people who helped get Mr. Sparks out of jail, including "the four old friends that kept their word when some blew hot air and gave false hope. We know who real and who isn't s**t."

Investigator Justin Bryant with the HCSO responded to the crime scene and was assigned to record individuals coming and going near Mr. Turner's street. At approximately 6:30 a.m., the defendant and Mr. Mayfield approached the intersection near Mr. Turner's house, and one of the passengers stated that they were going to Mr. Mayfield's ex-girlfriend's house. However, Investigator Bryant could not recall which passenger made the statement, and he did not allow the vehicle to pass the barricade.

Special Agent Sam Strickland with the TBI volunteered to lead the investigation. He arrived at Mr. Sims' residence at approximately 8:00 a.m. and began to document the scene. Special Agent Strickland later discovered that the shooting occurred at Mr. Turner's residence and proceeded to that location, where he took photographs and video of the scene and collected evidence. Special Agent Strickland observed blood on the front porch and front door, as well as in the entryway of the house. In the master bedroom, there was blood on the bed and bullet fragments on top of the mattress. In the top drawer of the dresser, Special Agent Strickland discovered two plastic bags containing unknown pills that were later identified as containing methamphetamine. He also observed a Walmart sack on a kitchen counter filled with syringes. Seven .9-millimeter shell casings were discovered on the floor near the threshold of the master bedroom, indicating that the shots were fired "at the doorway of the master bedroom and the front door area."

Special Agent Celinda Davidson with the TBI obtained a formal statement from the defendant at the Sheriff's Office on the day of the shooting. Although the defendant was not considered a suspect at that time, investigators believed "she may have useful information about the incident that happened." During the course of the interview, the defendant divulged that she had taken Mr. Martindale to Mr. Sparks' apartment following the shooting. She also told Special Agent Davidson that Mr. Martindale had scratches on his face when she picked him up and that she was later told that he and Mr. Mayfield had gotten into a physical altercation. She stated that she took Mr. Mayfield to his house from Mr. Sparks' apartment that morning. She told Special Agent Davidson that she was originally going to take Mr. Mayfield to an ex-girlfriend's house to retrieve some property, but they were unable to go there because the road was blocked. Additionally, the defendant stated that Mr. Sparks and Ms. Burcham were at her house on the night before the shooting between 8:00 and 9:00 p.m. before leaving to visit a friend in Mississippi.

Three days later, on March 25, 2019, Special Agent Davidson was walking through the lobby of the Sheriff's Office when she saw the defendant, who was in the building to add money to Mr. Sparks' jail account. Special Agent Davidson and the defendant spoke

briefly in the lobby, and the defendant stated that, in the week prior to Mr. Turner's murder, she and Ms. Burcham went to Mr. Turner's house. The defendant stated that she saw money and drugs "in the dresser."

During the course of the investigation, the defendant was developed as a suspect, and a search warrant was executed on her address on March 26, 2019. In a spare bedroom, officers discovered several of the items that were purchased at Walmart on the night of the murder, including the backpack, shotgun shells, Remington gun oil, holster, bandana, and black pullover. In the master bedroom, the .25 caliber chrome pistol was found on the bed underneath a pillow, and an empty box of .25 caliber ammunition was located on a bookcase.

Officer David Nabors, previously with the HCSO, was tasked with recovering the shotgun left behind by Mr. Martindale. As Officer Nabors was canvassing the woods, he observed a blue bandana hanging on a strand of barbed wire, and as he got closer, he saw a ghillie suit on the ground with a shotgun sticking out of it. Officer Nabors informed the TBI, who recovered the evidence.

Special Agent Matt Pugh with the TBI obtained the defendant's cell phone, and she provided consent to search it. The Tipton County Sheriff's Department performed a physical extraction of the defendant's cell phone, and Special Agent Pugh recovered numerous text messages between the defendant and Mr. Turner in the days leading up to the murder. On March 18, 2019, the defendant texted Mr. Turner and asked, "What does [Mr. Sparks] mean he will have to sit sixty days if we don't bond him out[?]" Mr. Turner replied, "His court date prolly ain't for another 60 days[.] I'll make his bond myself b4 then[.]" Later that day, the defendant texted Mr. Turner stating, "[Mr. Sparks] won't have his job. What do I do now[?] Bond him out or hire a lawyer[?]" Mr. Turner responded, "I mean if u got the money bond him out but otherwise u got have to let me get my check Thursday and make a move or 2." The next day, the defendant texted someone named Debora Earnest and stated that she was going to see if Mr. Turner was going to "do the property bond like he claimed." Two hours later, she texted Ms. Earnest that Mr. Turner "lied" about calling a bail bondsman for the defendant. On March 20, 2019, the defendant sent another text message to Mr. Turner requesting bond money stating, "all I can tell [Mr. Sparks] is I am waiting on you. So if you can't help him I need to know straight up so I can tell him he ain't getting out til I get the other five[.]" After Mr. Sparks was released from jail, the defendant sent a text message to someone named Alyssa stating, "I got [Mr. Sparks] out. [Mr. Turner] didn't help either. He will be dealt with[.]" The defendant also searched Mr. Turner's name on Facebook at 9:15 a.m. on the day of the murder.

Dr. Erica Curry, an expert in pathology, performed the autopsy on Mr. Turner. Dr. Curry testified Mr. Turner suffered seven gunshot wounds. The first bullet entered and

exited on the right side of his chest, causing only soft tissue and muscle injury. The second bullet was also to the right side of his chest and exited near his armpit, causing soft tissue injury. The third gunshot wound was to the left side of his abdomen and entered two different parts of his intestines, his pancreas, one of his kidneys, and his bladder before exiting the right side of his back. The wound caused approximately two liters of blood to accumulate in Mr. Turner's abdomen and was the fatal wound. The fourth bullet entered his right arm on the outside and traveled through soft tissue and muscles before exiting the right upper arm. The fifth bullet entered Mr. Turner's right elbow, traveled through soft tissue and muscles, and exited the inner right arm. The sixth bullet entered his left elbow, causing a fracture of the bone underneath the elbow. The final bullet entered the outside of Mr. Turner's left lower leg and traveled into his knee, causing soft tissue damage. Dr. Curry also observed a graze wound on the front of Mr. Turner's right thigh.

Ms. White suffered extensive injuries as a result of the shooting. She had two gunshot wounds, one in her back and one under her arm, and doctors were unable to remove the bullets from her body. The bullets punctured Ms. White's left lung and caused three broken ribs. Following the shooting, Ms. White spent seven days at the Regional One Hospital in Memphis, Tennessee.

Following deliberations, the jury found the defendant guilty of first-degree premeditated murder (count one), first-degree felony murder (count two), and attempted especially aggravated robbery (count six) with regards to her actions against Mr. Turner, and attempted first-degree murder (count three) and aggravated assault with serious bodily injury (count five) with regards to her actions against Ms. White. Following a sentencing hearing, the trial court imposed an effective sentence of life imprisonment.

The defendant filed a motion for new trial which the trial court denied. This timely appeal followed.

## *Analysis*

On appeal, the defendant contends the trial court erred in denying her motion to suppress. She also contends the evidence presented at trial was insufficient to support her convictions. The State contends that the trial court properly denied the defendant's motion to suppress and that the evidence is sufficient.

## I.    Motion to Suppress[6]

---

[6] For the sake of clarity, we have reordered and renumbered the issues from the order they appear in the defendant's brief.

The defendant argues the trial court erred in failing to grant her motion to suppress. Specifically, the defendant contends the second statement she gave to Special Agent Davidson in which she acknowledged knowing the location of Mr. Turner's drugs and money should have been suppressed because it occurred at the same location as her first statement, it "dealt with the same subject matter and investigation," and it included questions that were different from her first statement. Furthermore, the defendant asserts that no *Miranda* warnings were given. The State contends the trial court properly ruled the defendant was not in custody during her questioning. Upon our review, we agree with the State.

Suppression issues on appeal are subject to a well-established standard of review. Appellate courts are bound by a trial court's findings of facts determined after a suppression hearing unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Matthew T. McGee*, No. E2011-01756-CCA-R3-CD, 2012 WL 4017776, at *2 (Tenn. Crim. App. Sept. 13, 2012). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. Appellate courts should consider the entire record, affording the prevailing party "the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence." *McGee*, 2012 WL 4017776, at *2 (citing *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001)); *see also State v. Sanders*, 452 S.W.3d 300, 306 (Tenn. 2014). However, applying the law to the factual findings of the trial court is a question of law, which is reviewed *de novo* on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997).

The Fifth Amendment to the United States Constitution, applicable to states through the Fourteenth Amendment, states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Similarly, the Tennessee Constitution states "that in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. If a suspect is in police custody "or otherwise [has been] deprived of his freedom of action in any significant way," the police must first inform him of his Fifth Amendment rights for any subsequent confession to later be admissible as substantive evidence. *Miranda*, 384 U.S. at 444. In this regard, the United States Supreme Court has said, "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* These rights may be voluntarily, knowingly, and intelligently waived. *Id.*

The *Miranda* decision only applies "to the questioning of an individual who has been taken into custody or otherwise deprived of his freedom by the authorities in a significant way." *State v. Dailey*, 273 S.W.3d 94, 102 (Tenn. 2009) (quoting *Miranda*, 384

U.S. at 478) (internal quotation marks omitted). Accordingly, *Miranda* warnings are only required when a suspect is (1) in custody and (2) subjected to questioning or its functional equivalent. *State v. Walton*, 41 S.W.3d 75, 83 (Tenn. 2001). In the absence of either, *Miranda* requirements are not necessitated. *Id.*

The test for determining if an individual is in custody for *Miranda* purposes is "whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." *State v. Anderson*, 937 S.W.2d 851, 855 (Tenn. 1996). This is a fact-specific inquiry, and our Supreme Court has provided the following non-exhaustive list of relevant factors:

> [T]he time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt, and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

*Id.* The defendant bears the initial burden of proving custody for the purposes of *Miranda* before the burden shifts to the State to prove the voluntariness of the statement. *State v. Moran*, 621 S.W.3d 249, 258 (Tenn. Crim. App. 2020), appeal denied (Mar. 23, 2021).

Here, the defendant has failed to meet her burden of proving custody for the purpose of *Miranda* concerning the statement she made to Special Agent Davidson regarding her knowledge of the whereabouts of Mr. Turner's drugs and money. At the suppression hearing, the defendant did not present any proof to support her contention that she was in custody at the time she made the statement in the lobby of the Sheriff's Office. As such, the defendant clearly did not meet her burden of proving she was in custody at the time she made the statement.

Regardless, in reviewing the record as a whole, it is clear the defendant was not in custody when she made the statement to Special Agent Davidson. During the trial, Special Agent Davidson testified that she obtained a *Mirandized* statement from the defendant at the Sheriff's Office on the day of the shooting because investigators believed "[the defendant] may have [had] useful information about the incident." Three days later, as

Special Agent Davidson was walking through the lobby of the Sheriff's Office, she saw the defendant and approached her. As they spoke in the lobby, the defendant divulged that she saw money and drugs in Mr. Turner's dresser. At the suppression hearing, Special Agent Davidson testified that there were other people in the lobby during her conversation with the defendant, which lasted less than five minutes. The facts surrounding the defendant's conversation with Special Agent Davidson do not lead to the conclusion by a reasonable person that she would have been "deprived of movement to a degree associated with formal arrest." *See Anderson*, 937 S.W.2d at 855. As such, the record indicates the defendant was not in custody for purposes of *Miranda*, and the defendant has provided no proof to show otherwise. The defendant is not entitled to relief.

## II.    Sufficiency

The defendant generally argues the evidence was insufficient to support her convictions. She contends that the State relied on "conjecture, speculation, and assumptions," as well as the "self-serving statements" of Ms. Burcham and Mr. Mayfield and that none of the State's witnesses offered any testimony proving the defendant intended to murder or rob Mr. Turner or attempt to murder or harm Ms. White. The State submits the evidence is sufficient to support the defendant's convictions.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the following rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus, the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human

> atmosphere, and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

At trial, the State relied on a theory of criminal responsibility. "A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or both." Tenn. Code Ann. § 39-11-401(a). Criminal responsibility for the actions of another arises when the defendant, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, . . . solicits, directs, aids, or attempts to aid another person to commit the offense[.]" *Id.* § 39-11-402(2). Criminal responsibility is not a separate crime but "is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999).

The defendant need not physically participate in the crime in order to be criminally responsible. *Phillips v. State*, 76 S.W.3d 1, 9 (Tenn. Crim. App. 2001). "Presence and companionship with the perpetrator of a felony before and after the commission of the offense are circumstances from which one's participation in the crime may be inferred." *State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). "No particular act need be shown. It is not necessary for one to take physical part in the crime[;] [m]ere encouragement of the principal is sufficient." *Id.* The defendant must "knowingly, voluntarily and with common intent unite with the principal offenders in the commission of the crime." *State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988).

### A. First-degree Premeditated Murder

The jury convicted the defendant of the first-degree premeditated murder of Mr. Turner. First-degree murder is "a premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). In this context, premeditation is "an act done after the exercise of reflection and judgment." *Id.* § 39-13-202(d). Tennessee Code Annotated section 39-13-202(d) further states:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of

the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* "The element of premeditation is a question for the jury which may be established by proof of the circumstances surrounding the killing." *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006) (citing *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997)). The Tennessee Supreme Court has identified certain factors which tend to support a finding of premeditation, including: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660 (citing *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992); *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1992)). *Bland* does not include an exhaustive list of factors for consideration when finding premeditation. *State v. Adams*, 405 S.W.3d 641, 663 (Tenn. 2013). A conclusion the killing was premeditated may also be supported by the nature of the killing or evidence establishing a motive. *Id*. Likewise, lack of provocation by the victim, failure to render aid, and destruction or secretion of evidence may also support an inference of premeditation. *State v. Larkin*, 443 S.W.3d 751, 815-16 (Tenn. Crim. App. 2013) (internal citations omitted).

Although the defendant argues her conviction was "based solely on conjecture, speculation, and assumptions," the record does not support this argument. Rather, the evidence shows the defendant intended for Mr. Sparks to kill Mr. Turner and aided him in both the carrying out and concealment of the crime. The defendant became upset when Mr. Turner did not follow through with the bail money to help get Mr. Sparks out of jail, and she later told Mr. Sparks that she wanted Mr. Turner taken "care of." Ms. Burcham testified that she and Mr. Sparks had not made any plans toward Mr. Turner until the defendant stated that he needed to be taken "care of." Additionally, the defendant sent a text message to someone named Alyssa stating, "I got [Mr. Sparks] out. [Mr. Turner] didn't help either. He will be dealt with[.]" Mr. Sparks then assembled a crew, armed them with weapons, including the defendant's pistol, and explained that they were going to rob and murder Mr. Turner. Once inside Mr. Turner's house, Mr. Sparks walked toward the bedroom and opened fire, shooting Mr. Turner seven times.

The defendant picked up Mr. Martindale at a gas station after he got lost in the woods following the murder. When the defendant arrived at Mr. Sparks' apartment, she asked if "it was took care of," and Mr. Sparks responded that "it should be" because he "unloaded a whole clip." The defendant also asked if they had "gotten anything that [they] were supposed to, like the drugs [or] money." From the defendant's questions, Ms. Burcham and Mr. Mayfield deduced that the defendant knew what Mr. Sparks had planned

- 14 -

to do to Mr. Turner. The defendant also agreed to take Mr. Mayfield home and said that she would drive by Mr. Turner's house to "see what [she could] find out." While the defendant was taking Mr. Mayfield home, she called Mr. Sparks and asked where her pistol was, and Mr. Sparks stated that "he had it put up."

The following day, the defendant and Mr. Sparks burned some bandanas and a black toboggan used during the murder. The defendant later helped Mr. Sparks concoct alibis for himself, Ms. Burcham, Mr. Mayfield, and Mr. Martindale. She sent Mr. Mayfield a series of Facebook messages corroborating his alibi and also discussed the alibis during her conversations with Special Agent Davidson. Items used during the murder, including the defendant's pistol, were discovered during a search of the defendant's residence. This is sufficient evidence upon which a rational jury could find the defendant criminally responsible for the death of Mr. Turner.

Although the defendant argues that Ms. Burcham and Mr. Mayfield's testimonies consisted of "self-serving statements," we reiterate that "[q]uestions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *Bland*, 958 S.W.2d at 659. The defendant is not entitled to relief on this issue.

## B.  Attempted Especially Aggravated Robbery and First-degree Felony Murder

The jury convicted the defendant of the first-degree felony murder and attempted especially aggravated robbery of Mr. Turner. As relevant to this appeal, first-degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . attempted especially aggravated robbery[.]" Tenn. Code Ann. § 39-13-202(a)(2). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a). Especially aggravated robbery is robbery accomplished with a deadly weapon where the victim suffers serious bodily injury. *Id.* § 39-13-403(a). "'Serious bodily injury' includes bodily injury that involves: (A) a substantial risk of death; (B) protracted unconsciousness; (C) extreme physical pain; (D) protracted or obvious disfigurement; (E) protracted loss or substantial impairment of function of a bodily member, organ or mental faculty[.]" *Id.* § 39-11-106(a)(37). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]" *Id.* § 39-11-106(a)(3). The subjective nature of pain is a fact to be determined by the trier of fact. *State v. Eric A. Dedmon*, No. M2005-00762-CCA-R3-CD, 2006 WL 448653, at *5 (Tenn. Crim. App. Feb. 23, 2006), *no perm. app. filed*.

Criminal attempt occurs when a person "acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or

cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." *Id.* § 39-12-101(a)(3). To qualify as a "substantial step," the person's "entire course of action" must be "corroborative of the intent to commit the offense." *Id.* § 39-12-101(b).

In the light most favorable to the State, the evidence shows the defendant and Ms. Burcham went to Mr. Turner's house several times while Mr. Sparks was in jail, and the defendant indicated that she knew Mr. Turner kept ecstasy pills and money in the top drawer of his dresser. Following Mr. Turner's failure to provide Mr. Sparks' bail money, the defendant told Mr. Sparks that Mr. Turner needed to be taken "care of." Mr. Sparks and Mr. Mayfield entered Mr. Turner's house armed with guns and rummaged through a bag on the kitchen counter containing syringes and looked through kitchen drawers before moving toward the bedroom, where Mr. Sparks fatally shot Mr. Turner seven times. When the defendant arrived at Mr. Sparks' apartment later that morning, she asked if they had "gotten anything that [they] were supposed to, like the drugs [or] money." However, Mr. Sparks responded that they had not returned with anything. The defendant later assisted Mr. Sparks with destroying bandanas and a toboggan worn during the crime. Additional items, including the backpack, shotgun shells, gun oil, holster, pullover, and pistol were found in the defendant's home during a search. The evidence is sufficient to support the defendant's attempted especially aggravated robbery conviction under a theory of criminal responsibility.

Thus, we turn to the sufficiency of the evidence to support the conviction for felony murder in the perpetration of attempted especially aggravated robbery. As we have previously discussed, there was sufficient evidence from which a rational jury could reasonably find that the defendant was criminally responsible for the murder of Mr. Turner during the attempted especially aggravated robbery of his home. Accordingly, we conclude the evidence was sufficient to sustain the defendant's conviction for felony murder, and the defendant is not entitled to relief on this issue.

## C.    Attempted First-degree Murder

The jury convicted the defendant of the attempted first-degree murder of Ms. White. First-degree murder is "a premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). In this context, premeditation is "an act done after the exercise of reflection and judgment." *Id.* § 39-13-202(d). Tennessee Code Annotated section 39-13-202(d) further states:

> "Premeditation" means that the intent to kill must have been formed
> prior to the act itself. It is not necessary that the purpose to kill preexist in

the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* "The element of premeditation is a question for the jury which may be established by proof of the circumstances surrounding the killing." *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006) (citing *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997)). The Tennessee Supreme Court has identified certain factors which tend to support a finding of premeditation, including: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660 (citing *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992); *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1992)). *Bland* does not include an exhaustive list of factors for consideration when finding premeditation. *State v. Adams*, 405 S.W.3d 641, 663 (Tenn. 2013). A conclusion that the killing was premeditated may also be supported by the nature of the killing or evidence establishing a motive. *Id.* Likewise, lack of provocation by the victim, failure to render aid, and destruction or secretion of evidence may also support an inference of premeditation. *State v. Larkin*, 443 S.W.3d 751, 815-16 (Tenn. Crim. App. 2013) (internal citations omitted).

Criminal attempt occurs when a person "acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." *Id.* § 39-12-101(a)(3). To qualify as a "substantial step," the person's "entire course of action" must be "corroborative of the intent to commit the offense." *Id.* § 39-12-101(b).

As outlined supra, the defendant helped plan and cover up the crime. When Mr. Sparks entered Mr. Turner's house and indiscriminately fired his gun into Mr. Turner's bedroom, he shot Ms. White twice, including in the lung. The evidence is sufficient to support the defendant's attempted first-degree murder conviction under a theory of criminal responsibility. The defendant is not entitled to relief on this issue.

**D.    Aggravated Assault with Serious Bodily Injury**

The jury convicted the defendant of the aggravated assault with serious bodily injury of Ms. White. As charged in this case, aggravated assault occurs when a person intentionally or knowingly caused serious bodily injury to the victim. Tenn. Code Ann. §§

- 17 -

39-13-101(a)(1), -102(a)(1)(A)(i). "'Serious bodily injury' includes bodily injury that involves: (A) a substantial risk of death; (B) protracted unconsciousness; (C) extreme physical pain; (D) protracted or obvious disfigurement; (E) protracted loss or substantial impairment of function of a bodily member, organ or mental faculty[.]" Tenn. Code Ann. § 39-11-106(a)(37). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]" *Id.* § 39-11-106(a)(3). The subjective nature of pain is a fact to be determined by the trier of fact. *State v. Eric A. Dedmon*, No. M2005-00762-CCA-R3-CD, 2006 WL 448653, at *5 (Tenn. Crim. App. Feb. 23, 2006), *no perm. app. filed*.

As discussed supra, the defendant aided Mr. Sparks in carrying out and concealing the crime, during which Ms. White was shot twice. Ms. White testified that she suffered two gunshot wounds, one in her back and one in her lung, and that doctors were unable to remove the bullets from her body. The bullets caused three broken ribs and pierced one of her lungs. Following the shooting, Ms. White testified that she lost consciousness in the car on the way to Mr. Sims' house and did not regain consciousness until after Mr. Turner was being treated in the house by Mr. Sims. Ms. White was transported by helicopter to a hospital in Memphis where she spent seven days. This evidence is sufficient to support the defendant's aggravated assault with serious bodily injury conviction under a theory of criminal responsibility, and the defendant is not entitled to relief on this issue.

Finally, though not raised by either party, we note that the trial court failed to merge the defendant's first-degree felony murder conviction into the first-degree premeditated murder conviction at sentencing. *See State v. Cribbs*, 967 S.W.2d 773, 788 (Tenn. 1998) ("Obviously, when only one person has been murdered, a jury verdict of guilt on more than one count of an indictment charging different means of committing first degree murder will support only one judgment of conviction . . . ."). Accordingly, we remand the case to the trial court for entry of corrected judgments reflecting proper merger of the convictions.

### *Conclusion*

For the aforementioned reasons, the judgments of the trial court are affirmed. However, we remand this case for entry of corrected judgments as specified in this opinion.

_____
J. ROSS DYER, JUDGE

- 18 -